909 A.2d 1048

**Ernest James MYERS**

v.

**STATE of Maryland.**

**No. 132 Sept.Term 2005.**

Court of Appeals of Maryland.

Oct. 24, 2006.

Bradford C. Peabody, Assistant Public Defender (Nancy S. Forster, Public Defender, of Baltimore), on brief, for petitioner.

Kathryn Grill Graeff, Assistant Attorney General (J. Joseph Curran Jr., Attorney General of Maryland, of Baltimore), on brief, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

This case stems from a stop, arrest, and search of petitioner, Ernest Myers, on February 12, 2003, in Pennsylvania. The stop and detention of Myers led to the discovery of an outstanding arrest warrant and the discovery of stolen goods located in his vehicle.[1] Eight days after the stop, but prior to Myers's conviction in Pennsylvania, Maryland law enforce-

---

1. Myers was convicted in Pennsylvania for "theft by receipt of stolen goods." The Superior court of Pennsylvania ("Superior Court"), that state's intermediate appellate court, held that the Pennsylvania trial court incorrectly failed to suppress evidence obtained as a result of an

ment agents used information gained from the stop and search of Myers's vehicle in Pennsylvania to obtain a Maryland search warrant. A subsequent search of a Maryland residence yielded evidence that linked Myers to several burglaries in Maryland.[2]

The Circuit Court for Washington County denied Myers's motion to suppress and admitted into evidence several stolen items which were recovered from a residence in Hagerstown ("Hagerstown residence"). Myers was convicted by a jury of theft of property having a value of five hundred dollars ($500.00) or greater,[3] and was sentenced to ten-years imprisonment. He appealed to the Court of Special Appeals challenging the trial court's denial of his motion to suppress evidence, the alleged illegality of his arrest, and the legal sufficiency of the evidence to sustain his conviction. *Myers v. State*, 165 Md.App. 502, 885 A.2d 920 (2005). The Court of Special Appeals affirmed Myers's conviction, and he filed a petition for a writ of certiorari in this Court, which we granted. *Myers v. State*, 391 Md. 577, 894 A.2d 545 (2006).

The issue for our review is whether an arrest, pursuant to an outstanding arrest warrant, and subsequent Maryland search warrants were sufficiently attenuated from a traffic stop, which the Pennsylvania Superior Court determined was illegal under Pennsylvania law. We hold that the arrest of Myers pursuant to an outstanding arrest warrant sufficiently attenuated the taint of the traffic stop in Pennsylvania.

## FACTS

We adopt the facts as accepted by the Court of Special Appeals, including those set forth by the Pennsylvania Superior Court:

---

illegal search and reversed Myers's conviction. *Commonwealth v. Myers*, 858 A.2d 1278 (Pa.Super.Ct.2004)(unpublished).

**2.** Mail for Myers was addressed to a "Hagerstown residence," but it is unclear whether Myers owned the home, paid rent or even lived there at all, or whether he only received mail at that address.

**3.** Md. Code (2002), § 7–104 of the Criminal Law Article.

The charge and conviction in this case was based on the theft of property taken on October 11, 2002, from the residence of Joseph Marinelli in Washington County.

* * * *

The facts, in pertinent part, as set forth in the Superior Court's opinion (quoting from the trial court's opinion), are as follows [:]

On February 12, 2003, at approximately [6:40 p.m.], Officer Clifford Weikert of the Carroll Valley Borough Police Department, while in a marked vehicle on routine patrol, observed a red Dodge Sundance unoccupied and parked in a no-parking zone along Northern Pike Trail. As he proceeded down the roadway past the vehicle, Officer Weikert observed a black male individual wearing a dark stocking cap and dark clothing walking toward the vehicle. As Officer Weikert passed this individual, Officer Weikert observed this individual bend over and apparently cover his face from Officer Weikert's view. Alerted by these actions, Officer Weikert proceeded down the road, immediately turned his vehicle around, and returned towards the area where he observed the individual and the vehicle. As he headed toward the parked vehicle, Officer Weikert observed the red Dodge Sundance pass him at a high rate of speed. Based upon the distance between the location where Officer Weikert initially observed [Myers], the location of the parked vehicle and the amount of time that passed while Officer Weikert turned his vehicle around, Officer Weikert opined that the individual must have sprinted to the vehicle since the time of his initial observation. When the Dodge Sundance passed the police vehicle, Officer Weikert once again turned his vehicle around in order to follow the Dodge Sundance. While following the vehicle, he estimated it was traveling at a rate of speed of 40 miles per hour in a 25 mile per hour zone.

Officer Weikert indicated that at the time he observed the individual walking along the roadway, he was aware of a description of a suspect from a February 5, 2003 incident, in

which a known eyewitness described a person involved in an attempted burglary. Specifically, Officer Weikert was aware that the suspect involved in the February 5, 2003, incident was wearing charcoal gray clothing, a dark blue cap, and was a black male between 5'6" and 5'10" in height. Officer Weikert was also aware that several weeks prior to this incident there were a number of burglary or criminal trespass related incidents occurring in the Carroll Valley Borough area. . . .

\* \* \* \*

Prior to the stop of the individual's vehicle, Officer Weikert was also aware that the investigation into the criminal incidents . . . revealed that each of the incidents occurred between 6:00 p.m. and 9:00 p.m., which was a time consistent with the time of Officer Weikert's observation of the subject in dark clothing. According to Officer Weikert, the recent number of burglaries within the Carroll Valley area was excessive and unusual based upon his experience as a Carroll Valley police officer and his familiarity with the area.

\* \* \* \*

Officer Weikert initiated a traffic stop of the vehicle. At the time of the traffic stop, Officer Weikert observed in plain view a large screwdriver within the vehicle, which appeared to him to be consistent with a screwdriver capable of making pry marks [similar to those] found at [the other recent burglaries]. Officer Weikert identified the driver as [Myers] and took him into custody on outstanding warrants from a neighboring jurisdiction.[4] As a result of a search incident to his arrest,

---

**4.** Investigator Greg Alton, Washington County Sheriff's Department, testified in the Circuit Court for Washington County at a suppression hearing that Myers was arrested on an outstanding arrest warrant:

   THE STATE: All right. But once you spoke with [Trooper] Guyer, he explained to you that there was a warrant that had been entered [for Myers]?

   INVESTIGATOR ALTON: He informed me that [Myers] had actually been arrested on a warrant.

   THE STATE: On a warrant.

several items of rare United States Currency and a savings bond titled in another person's name were recovered from [his] person. The screwdriver was seized, the vehicle was impounded, and a search warrant was obtained for a search of the vehicle. During the subsequent search, a number of pieces of jewelry were found in the front console and seized as evidence.

[* * * *]

Suppression Hearing—Maryland

[A]fter [Myers] was charged in this case, he filed a motion to suppress all evidence. At the suppression hearing, Trooper Eric Guyer, with the Pennsylvania State Police, and Investigator Greg Alton, with the Washington County Sheriff's Department, testified.

Trooper Guyer testified to the following: In September, 2002, he was assigned to the criminal investigation division and continued an investigation, begun by his predecessor, of several burglaries with similar modes of operation. In connection with that investigation, Trooper Guyer had frequent contact with Investigator Alton.

---

INVESTIGATOR ALTON: Yes.
THE STATE: Separate and apart from the traffic stop for which he's initially detained?
INVESTIGATOR ALTON: Yes, ma'am.
It is unclear, however, which state issued Myers's arrest warrant, Pennsylvania or Maryland, or even a neighboring jurisdiction. On October 27, 2004, Trooper Guyer testified in the Circuit Court for Washington County, at the suppression hearing, that he believed the warrant was issued in York County, Pennsylvania. In his Opinion and Order denying Myers's motion to suppress, the Maryland trial judge characterized the warrant as "the *Maryland* arrest warrant." Myers argued only that the initial stop was invalid. Myers has not challenged the validity of the arrest warrant. Rather, he concedes that he was arrested on an outstanding arrest warrant.
Moreover, any issue as to the validity of the warrant was not preserved for appeal because the State failed to enter the arrest warrant into evidence, and Myers did not object to the State's failure to produce the warrant.

On February 12, 2003, the day of the traffic stop, Trooper Guyer went to the Carroll Valley[, PA] Police Department station. At that time, Trooper Guyer became aware of evidence that had been seized from [Myers] and his vehicle. Trooper Guyer also interviewed [Myers]. Trooper Guyer contacted Investigator Alton and shared information. As a result of information obtained from the evidence seized, officers applied for and obtained search warrants, which were executed.[5] The evidence obtained included stolen property and physical evidence connecting [Myers] to various crime scenes.

---

**5.** The Washington County District Court judge found that probable cause existed to support three separate warrants: (1) to search the Hagerstown residence (26 Belview Avenue) and vehicles parked in the driveway; (2) to search a vehicle parked on the street near the residence; and, (3) to obtain a blood sample from Myers.

The affidavit and application in support of the search warrant issued for the Hagerstown residence contained a description of items recovered from Myers during a search incident to his arrest in Pennsylvania, including rare currency and silver certificates, a stolen savings bond issued to someone else, jewelry from other burglaries in Washington County, documents listing Myers's address as 26 Belview Avenue, and medical cards with the name of Michelle King (who was, also, listed on utility records as the individual renting 26 Belview Avenue). Michelle King, Myers's alleged girlfriend, resided at the Hagerstown residence. The record is vague regarding the nature of the documents which connected Myers to the residence. The application stated that "proprietary information" was recovered, and Investigator Alton testified that the items were "proprietary documents."

In addition, the affidavit and application, in support of the search of 26 Belview Avenue, provided that: (1) two large screwdrivers were noticed in Myers's vehicle during the Pennsylvania stop; (2) a screwdriver-type tool as the *modus operandi* for numerous burglaries as the tool used to pry open the door of residential properties in Pennsylvania and Maryland; (3) Myers was picked out of a photo lineup for a burglary in Pennsylvania; (4) boot impressions from several burglaries matched Myers's boots, including one in Washington County; (5) Myers's parole was transferred to Maryland because he indicated he lived there; and (6) an investigator noticed that a car registered to Myers was parked at 26 Belview Avenue.

Finally, the affidavit and application seeking a warrant to obtain a blood sample from Myers indicated that droplets of blood were found inside a Pennsylvania residence which had been burglarized. Later, a

Investigator Alton testified that he began investigating burglaries in December 2001 and that he had identified [thirty-four] burglaries with a similar mode of operation. Prior to the traffic stop of [Myers] in Pennsylvania, Investigator Alton had a description of a suspect, described as a black male 5'7" or 5'8" in height. This information was made available to various police departments. Investigator Alton did not know [Myers] and had not identified him as a suspect. Investigator Alton was aware that the arrest of [Myers] on February 12, 2003, was on an outstanding arrest warrant.

Based on information obtained from the evidence seized from [Myers], Investigator Alton obtained and executed search warrants in Maryland. One of the places searched was a residence located at 26 Belview Avenue in Hagerstown. During the search, the police seized stolen property, some of which had been stolen from the residence of Joseph Marinelli on October 11, 2002. The police found other items.... The search warrants were obtained and executed prior to the Superior Court's decision.

At the suppression hearing [in the Circuit Court for Washington County], five search warrants were introduced into evidence as State exhibits, and the Superior Court's opinion was introduced as a court exhibit.

The [C]ircuit [C]ourt denied [Myers's] motion to suppress. The court explained:

> At the time of the vehicle stop [... Myers] had an outstanding arrest warrant issued by the State of Maryland, which is not disputed.[6] This court holds that once he was identified by the Pennsylvania authorities and confirmed that he had an outstanding warrant by a neighboring jurisdiction, he was lawfully detained. Maryland law is clear that the issue of identity discovered during an illegal detention is not subject to exclusion by the "fruit of the poisonous

---

Pennsylvania lab determined that Myers's blood matched the DNA of the blood recovered at the scene.

6. *See supra* at note 4.

tree" doctrine. *Modecki v. State*, 138 Md.App. 372, 771 A.2d 521 (2001). The subsequent search and seizure of [Myers] and his vehicle pursuant to the arrest warrant, and not because of the traffic stop itself was therefore lawful.

## Trial

Joseph Marinelli testified that someone entered his home on October 11, 2002, by breaking the kitchen door. He testified that various items were taken, including three strongboxes. One contained the deed to his house and related papers. Another contained jewelry, including five watches which he valued at $1900. The third contained U.S. Savings Bonds, which he had to cash in, and by doing so, lost four thousand dollars. Mr. Marinelli described other items taken, including a credit card, a backpack, a class ring, a gold charm, and pens and pencils.

Detective Chris Kayser, with the Hagerstown Police Department, testified that he investigated the break-in at Mr. Marinelli's home. He stated that the value of items stolen, as reported by Mr. Marinelli, included a gold charm valued at $500, a high school class ring valued at $100, and a pearl tie clip valued at $500. He stated that the total loss was reported as $18,840.00. Some of the items were recovered during the search of 26 Belview Avenue.

Investigator Alton testified that he obtained a search warrant for 26 Belview Avenue and executed it on February 20, 2003. When he executed the warrant, a "teenaged female" answered the door, who contacted her mother, Michelle King Hewitt. The officer explained why he and other officers were there, and they then searched the residence. The officers recovered various items of stolen property, including property owned by Mr. Marinelli. The recovered property owned by Mr. Marinelli included a strongbox containing a deed and other papers, two watches, a backpack, and a pocketknife. Investigator Alton testified that, in addition to stolen property, he found mail and bills addressed to [Myers] at 26 Belview Avenue. He also found male clothing in an upstairs bedroom.

[Myers] stipulated that property that Mr. Marinelli identified as his was recovered from 26 Belview Avenue. (alteration added).

The jury found [Myers] guilty of theft and that the value of the property stolen had a value of $500 or greater. (alteration in original). *Myers*, 165 Md.App. at 507–13, 885 A.2d at 922–26 (footnote omitted).

In his appeal to the Court of Special Appeals, Myers argued that the motion to suppress should have been granted because the ruling of the Superior Court was at least persuasive, if not binding authority, and the stop of Myers's vehicle was unlawful. Myers contended that "the [C]ircuit [C]ourt was required to cull out all tainted information and make a probable cause determination," which that court failed to do. *Myers*, 165 Md.App. at 513, 885 A.2d at 926.

The Court of Special Appeals disagreed and held that the Pennsylvania court's ruling was only binding with respect to its conclusion that probable cause was lacking to make a stop, based on Pennsylvania motor vehicle laws. The intermediate appellate court "expressed no [independent] opinion on the validity of the stop based on whether there was probable cause to believe a traffic violation occurred." *Myers*, 165 Md.App. at 517 n. 4, 885 A.2d at 929 n. 4. The court also held that the Superior Court's holding, pertaining to the issue of reasonable articulable suspicion of criminal activity and the application of the exclusionary rule as a remedy for a Fourth Amendment violation, was not binding on Maryland courts.

On the basis of Maryland case law, interpreting federal constitutional law, the Court of Special Appeals agreed with the Superior Court's holding that the stop was made without reasonable articulable suspicion of criminal activity and in violation of the Fourth Amendment. As to the availability of a remedy for violation of the Fourth Amendment, the intermediate appellate court held that because the officer did not make the stop for the purpose of enforcing the outstanding arrest warrant, "[t]he exclusionary rule [ . . . did] not require suppression of the evidence obtained as a result of the search

incident to a valid arrest on an outstanding warrant." *Myers,* 165 Md.App. at 528, 885 A.2d at 935.

## STANDARD OF REVIEW

When reviewing a Circuit Court's denial of a motion to suppress, our scope is ordinarily limited to the record of the suppression hearing and does not include the record of the trial. See *Byndloss v. State,* 391 Md. 462, 477, 893 A.2d 1119, 1128 (2006). We consider the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the prevailing party. See *Whiting v. State,* 389 Md. 334, 345, 885 A.2d 785, 791 (2005). Ordinarily, we will defer to the factual findings of the suppression hearing judge. See *State v. Green,* 375 Md. 595, 607, 826 A.2d 486, 493 (2003). The legal conclusions, the application of the law to the facts, and the determination of whether the evidence should be suppressed are reviewed by this Court de novo. See *Swift v. State,* 393 Md. 139, 155, 899 A.2d 867, 876 (2006); *Whiting,* 389 Md. at 345, 885 A.2d at 791.

## DISCUSSION

Myers contends that this Court is bound by the previous decision of the Pennsylvania Superior Court in *Commonwealth v. Myers,* 858 A.2d 1278 (Pa.Super.Ct.2004) (unpublished) with regard to that court's rulings on: (1) probable cause to believe a traffic violation had occurred; (2) probable cause to suspect Myers was involved in criminal activity; and (3) the application of the exclusionary rule to evidence seized by Pennsylvania law enforcement officers. Myers also asserts that even if this Court is not bound by the Superior Court's decision, the evidence obtained subsequent to his arrest on an outstanding arrest warrant was derived from the fruit of the poisonous tree and, therefore, should have been excluded from the subsequent Maryland search warrant application. Myers maintains that absent the illegally obtained evidence, Maryland police would have been unable to make the requisite showing of suspicion of criminal activity for the magistrate to

grant a search warrant for the Hagerstown residence. According to Myers, the evidence obtained by the Hagerstown police from the Hagerstown residence should have been suppressed by the trial court on Myers's motion.

The State's response is that the outstanding warrant for Myers's arrest sufficiently broke the causal connection between the illegal stop and the evidence seized thereafter. The State claims that Investigator Alton acted in good faith when he applied for and obtained the search warrants. Furthermore, the inevitability that the evidence would have been seized due to the outstanding warrant breaks the causal connection between the invalid stop and the evidence found in the Hagerstown residence. In addition, the State asserts that the subsequent search warrant was justified and any evidence seized during the search was not required to be suppressed at trial.

## Validity of the Stop

We have long recognized that "[t]he legality of [an] arrest and, therefore, the reasonableness of the search and seizure incident to the arrest, turns on the law of the State in which the arrest was made, absent a controlling federal statute." *Stanley v. State,* 230 Md. 188, 191, 186 A.2d 478, 480 (1962) (citing *United States v. Di Re,* 332 U.S. 581, 589, 68 S.Ct. 222, 226, 92 L.Ed. 210, 217 (1948)) (cases cited therein). See *Michigan v. DeFillipo,* 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343, 348–49 (1979); *State v. Evans,* 352 Md. 496, 518, 723 A.2d 423, 433–34 (1999); *Little and Odom v. State,* 300 Md. 485, 493, 479 A.2d 903, 907 (1984) (acknowledging that "stopping an automobile and detaining its occupants constitutes a seizure' within the meaning of the Fourth and Fourteenth Amendments to the federal constitution, even though the purpose of the stop is limited and the resulting detention is quite brief") (citing *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667 (1979)).

It is equally well settled in Maryland that, without a warrant, a police officer may arrest a suspect for a misde-

meanor committed in the officer's presence or for a felony of which the officer has reasonable cause to believe the defendant guilty. *Stanley*, 230 Md. at 193, 186 A.2d at 480–81. These standards are consistent with the federal constitutional principle that the stop of a motorist on the basis of probable cause, or reasonable suspicion that the motorist was engaged in conduct in violation of the criminal law, are constitutionally reasonable when measured against an "objective standard." See *Prouse*, 440 U.S. at 654, 99 S.Ct. at 1396, 59 L.Ed.2d at 668. In *Whren v. U.S.*, 517 U.S. 806, 812–13, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89, 97–98 (1996), the Supreme Court held that a traffic stop is reasonable so long as the officer had probable cause to believe that the driver violated a traffic law even if the officer decided to stop the vehicle because the officer subjectively intended to use the stop as a means to investigate unrelated criminal activity. In *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889, 911 (1968), the Supreme Court held that "where a police officer observes unusual conduct which leads him reasonably to conclude[,] in light of his experience[,] that criminal activity may be afoot . . . [,]" he is entitled to stop the person.

In the instant case, the Court of Special Appeals relied on a prior decision of that court to support its determination "that the [Pennsylvania] Superior Court's decision is binding with respect to its conclusion that there was no probable cause for the stop based on a violation of the motor vehicle laws." *Myers*, 165 Md.App. at 515, 885 A.2d at 927. In addition, the intermediate appellate court held that the Pennsylvania Superior Court's decision "is [neither] . . . binding as to the remedy [, nor] its conclusion that there was no reasonable articulable suspicion of criminal activity." Id. The intermediate appellate court, however, "expressed no [independent] opinion on the validity of the stop based on whether there was probable cause to believe a traffic violation occurred." *Myers*, 165 Md.App. at 517 n. 4, 885 A.2d at 929 n. 4.

The Court of Special Appeals relied on *Moore v. State*, 71 Md.App. 317, 323, 525 A.2d 653, 656 (1987), which held that because the District of Columbia applied federal constitutional

law to its analysis of probable cause, the Maryland court was not bound to follow the District of Columbia's law of arrest. Thus, in testing the validity of the arrest in Moore, the court referred to its prior decision in *Berigan v. State*, 2 Md.App. 666, 668, 236 A.2d 743, 744 (1968). The Moore court stated:

Since the arrest occurred in the District of Columbia, under the ruling in [Berigan], we apply that jurisdictions's "law" in testing the validity of the arrest. While the Berigan Court did not delineate what it meant when referring to the "law" of the arrest jurisdiction, the word "law" must refer to the particular statutes and constitutional provisions of that jurisdiction. Where ... [the arresting jurisdiction's] statutory and constitutional provisions are not in contravention of the United States Constitution, and to the extent that they expand an arrestee's rights, clearly those provisions control any decision concerning the validity of an arrest. If the word "law" in Berigan meant case law interpreting federal constitutional law, under the principles of federalism, a sister state's constitutional interpretation would not necessarily be binding in this State. Where, however, that sister state's interpretation is persuasive, as was the case in Berigan, a Maryland court may adopt that jurisdiction's analysis. *Moore*, 71 Md.App. at 322–23, 525 A.2d at 656.

First, we will assume arguendo, for purposes of Fourth Amendment probable cause analysis, that under Pennsylvania law the traffic stop was invalid because, pursuant to a Pennsylvania statute, the police officer did not have probable cause to justify the stop. We need not, and do not, decide whether Maryland courts are bound to follow Pennsylvania's conclusion that probable cause was lacking to justify the stop,[7] because any taint from that stop was sufficiently attenuated by the

---

7. Under Maryland law, Office Weikert's mental impression of Myers's speed, under the circumstances, might have been adequate probable cause or, at a minimum, reasonable suspicion that Myers was traveling in excess of the posted speed. See *Beahm v. Shortall*, 279 Md. 321, 336, 368 A.2d 1005, 1014 (1977) (noting that "[i]t is established that a nonexpert witness may testify as to the speed of a vehicle in terms relating to fast or slow, but a witness may not fix the rate of speed as so much per hour without having shown some special knowledge which would enable him [or her] to speak as an expert").

arrest warrant and the subsequent arrest of Myers pursuant to that warrant. Secondly, we agree with the Court of Special Appeals that the Federal Exclusionary Rule, ordinarily, is the appropriate remedy for a violation of the Fourth Amendment. We reach this conclusion because the Pennsylvania courts did not expressly rely on state constitutional provisions or an exclusionary rule based upon Pennsylvania state law in deciding that Myers's motion to suppress evidence should have been granted.

During proceedings in the Pennsylvania trial court, Myers moved to suppress any evidence obtained as a result of the stop of his vehicle. The trial judge denied that motion. In addition, Myers filed a motion in limine to preclude the introduction of evidence relating to his conduct on the date of his arrest. The trial judge granted the motion in limine to "preclude the introduction of the screwdrivers found in the vehicle, the evidence of burglaries in the Carroll Valley area, and the evidence of clothing worn by [Myers]." The trial judge denied the motion as to Myers's request to preclude the testimony of Officer Weikert as it related to his observations of [Myers] on the date of his arrest. Myers was convicted, and he appealed his conviction to the Pennsylvania Superior Court.

In his brief submitted to the Superior Court of Pennsylvania, Myers "raised the following question[] for ... review: [w]hether the trial court erred in finding that the stop of [his] vehicle was based on probable cause?" *Commonwealth v. Myers,* 858 A.2d at 1278. The Superior Court addressed the explanations proffered by the Commonwealth to justify Officer Weikert's stop of Myers's vehicle. The Commonwealth argued that the stop was justified because the officer believed that Myers was traveling in excess of the posted speed in violation of the Pennsylvania Vehicle Code and was engaging or had engaged in other criminal activity. The Pennsylvania court rejected both arguments. The Superior Court first examined whether Officer Weikert had probable cause to stop Myers for a suspected violation of Pennsylvania's Vehicle Code. The court summarized the history, as determined at the

Pennsylvania suppression hearing, in relevant part, as follows: Myers drove past Officer Weikert at what the officer described as "a high rate of speed." According to the factual findings, "[w]hen the Dodge Sundance [, Myers's vehicle,] passed the police vehicle, Officer Weikert once again turned his vehicle around in order to follow the . . . [car]. While following the vehicle for two-tenths of a mile, he estimated it was traveling at a rate of speed of 40 miles per hour in a 25 mile per hour zone."[8] *Myers*, 858 A.2d at 1278. Because Officer Weikert failed to use a speed measuring device, as required by 75 Pa. Cons.Stat. § 3368[9], to support his belief that Myers was in violation of 75 Pa. Cons.Stat. § 3362, the Pennsylvania Superior Court concluded that the officer's "subjective, unreliable estimate of a vehicle's speed [was] not sufficient to establish a violation of the Vehicle Code." *Myers*, 858 A.2d at 1278. Thereafter, the Superior Court held that "the Commonwealth [did] not establish [] that the officer had reasonable and articulable grounds to suspect that [Myers] had violated a provision of the Vehicle Code, sufficient to support the stop of his vehicle."[10] *Myers*, 858 A.2d at 1278.

---

8. 75 Pa.Cons.Stat. § 3361, Driving a vehicle at safe speed provides, in relevant part: "No person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard for the actual and potential hazards then existing, nor at a speed greater than will permit the driver to bring his vehicle to stop within the assured clear distance ahead . . . ."

75 Pa. Cons. Stat. § 3362 (Establishes The Maximum Lawful Speed Limits In Pa.).

9. 75 Pa. Cons. Stat. § 3368(a) provides **(a) Speedometers Authorized.**— The rate of speed of any vehicle may be timed on any highway by a police officer using a motor vehicle equipped with a speedometer. In ascertaining the speed of a vehicle by the use of a speedometer, the speed shall be timed for a distance of not less than three-tenths of a mile.

10. 78 Pa. Cons. St. § 6308(b) provides: **Authority of police officer.**— Whenever a police officer . . . has *articulable and reasonable grounds* to suspect a violation of this title, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or driver's license, or to secure such other information as the officer

As to the other allegations of criminal activity, the Superior Court determined that Officer Weikert lacked reasonable suspicion to stop Myers's vehicle because the allegations that Myers matched a general description of an individual suspected of an attempted burglary one week prior to the date of his arrest, and that he was observed within the broad time frame and within the broad geographic area of burglaries that had occurred in the preceding month, was insufficient to establish that he was engaged in criminal activity at the time when he was stopped by the officer. Id. In addition, the Superior Court concluded that the allegation that Myers fled the scene after "being observed approximately 100 yards from an illegally parked vehicle, was not sufficient to form the basis for reasonable suspicion." Id. The Court of Special Appeals agreed with the Superior Court that Officer Weikert did not have reasonable suspicion to believe that Myers was involved in any criminal activity involving burglaries. See *Myers*, 165 Md.App. at 518–23, 885 A.2d at 929–32 (noting the vague description of the suspected perpetrator, the time elapsed between the previous crime, and the large area within which the crime had occurred).

■ We agree with the Superior Court and the Court of Special Appeals that Officer Weikert lacked reasonable articulable suspicion to believe that Myers had been involved in any burglaries in the area. In the instant case, Officer Weikert had only a vague description of the burglary suspect such that

---

may reasonably believe to be necessary to enforce the provisions of this title. (Emphasis added.)

In *Commonwealth v. Whitmyer*, 668 A.2d 1113 (Pa.1995), the Pennsylvania Supreme Court pointed out that the "articulable and reasonable grounds" standard contained in § 6308(b) was a "probable cause" standard. *Whitmyer*, 668 A.2d at 1116. See *Commonwealth v. Gleason*, 567 Pa. 111, 785 A.2d 983, 989 (2001) (reaffirming that a police officer must have probable cause to believe that the driver has violated a provision of the Vehicle Code in order to justify a traffic stop). Effective February 1, 2004, subsequent to the stop in this case, the Pennsylvania General Assembly amended § 6308(b) clarifying that police officers are authorized to stop a vehicle based upon reasonable suspicion, rather than probable cause, that a violation of the Vehicle Code is occurring or has occurred. See 75 Pa. Cons. Stat. § 6308(b).

any observed similarity between Myers and the description of the suspected burglar was insufficient to give rise to reasonable articulable suspicion of past criminal activity. In addition, Myers's attire, his proximity to the area of previously reported crimes, and his driving off in a car failed to provide reasonable articulable suspicion of criminal activity. We emphasize, however, that this determination is made independent of Pennsylvania's interpretation of reasonable suspicion, and is based instead on this Court's interpretation of federal constitutional requirements as applied to the instant case.

This Court has stated that to determine whether an officer had reasonable articulable suspicion to justify a Terry stop, courts "must look at the totality of the circumstances' of each case to see whether the detaining officer ha[d] a particularized and objective basis' for suspecting legal wrongdoing." *Collins v. State*, 376 Md. 359, 368, 829 A.2d 992, 998 (2003) (quoting *U.S. v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740, 749 (2002)) (citations omitted). In *Collins*, we pointed out that in our decision in *Cartnail*, 359 Md. at 289, 753 A.2d at 528, we examined . . . six factors . . . as appropriate considerations in determining what constitutes reasonable suspicion: (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.' *Collins*, 376 Md. at 369, 829 A.2d at 998 (citation omitted). In our analysis of the vehicle stop, we have accepted the premise that Officer Weikert did not have probable cause or reasonable suspicion to stop Myers's vehicle for reasons stated previously in this opinion. Accordingly, we must determine whether the evidence admitted at Myers's trial in Maryland came from the "exploitation of that illegality or instead by [a] means sufficiently distinguishable to be purged of the primary taint."

*Wong Sun v. U.S.*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963).

## Evidence Obtained as a Result of a Fourth Amendment Violation and the Exclusionary Rule

The issue of whether an outstanding arrest warrant discovered subsequent to an illegal traffic stop and detention is sufficient to attenuate the taint of an unconstitutional seizure, is a question of first impression for this Court. To answer that question, we will review both federal and state cases, as well as our decision in *Ferguson v. State*, 301 Md. 542, 549, 483 A.2d 1255, 1258 (1984), to resolve whether the suppression of evidence obtained as a result of Myers's traffic stop in Pennsylvania would have been proper.

When government officials violate the dictates of the Fourth Amendment, the usual remedy is to suppress any of the resulting physical, tangible materials and verbal evidence. See *Wong Sun v. U.S.*, 371 U.S. at 485–86, 83 S.Ct. at 416, 9 L.Ed.2d at 453–54. Illegally obtained evidence is excluded under the exclusionary rule—a judicially imposed sanction for violations of the Fourth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 657, 81 S.Ct. 1684, 1692–93, 6 L.Ed.2d 1081, 1090–91 (1961). The purpose of the rule is to deter lawless and unwarranted searches and seizures by law enforcement officers. See *Wong Sun*, 371 U.S. at 484–85, 83 S.Ct. at 416, 9 L.Ed.2d at 454; *Terry*, 392 U.S. at 13–16, 88 S.Ct. at 1875, 20 L.Ed.2d at 900; *Ferguson*, 301 Md. at 549, 483 A.2d at 1258.

The exclusionary rule, as a remedy for violations of the Fourth Amendment, was first recognized by the Supreme Court in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The Supreme Court in *Olmstead v. United States*, 277 U.S. 438, 462, 48 S.Ct. 564, 567, 72 L.Ed. 944, 949–50 (1928), summarized that Court's holding in Weeks as follows:

The striking outcome of the Weeks case and those which followed it was the sweeping declaration that the Fourth

Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction by government officers through a violation of the Amendment. In *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), Justice Holmes, writing for the Supreme Court, noted that the Fourth Amendment is reduced to a form of words if "the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act." [11] Accordingly, "the Supreme Court held that the exclusionary rule [also] applied to incriminating evidence derived from the primary evidence." *Ferguson,* 301 Md. at 548, 483 A.2d at 1257 (emphasis added) (holding that testimony concerning a victim's extrajudicial identification of the defendant was required to be suppressed as fruit of the illegal arrest of the defendant, but the victim's in-court identification of the defendant was admissible as it had an independent source from the illegal arrest). In Ferguson, this Court noted that Silverthorne marked the genesis of the fruit of the poisonous tree doctrine. *Ferguson,* 301 Md. at 548, 483 A.2d at 1257. Summarizing the development of the fruit of the poisonous tree doctrine, Judge Cole, writing for this Court, said that "the [Supreme] Court [later] extended the exclusionary rule to evidence that was the indirect product or fruit' of the police conduct resulting from a violation of the [F]ourth [A]mendment." Id. (citing *Wong Sun,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441). To that end, in Ferguson, we acknowledged that the fruit of the poisonous tree doctrine is but "an aspect of the exclusionary rule." [12] *Ferguson,* 301 Md. at 548

---

**11.** In *Silverthorne,* government officials went to the Silverthorne's office and retrieved books, papers and documents in violation of Silverthorne's Fourth Amendment rights. The government repudiated and condemned the illegal seizure, yet sought to "maintain its right to avail itself of the knowledge obtained . . . which otherwise it would not have had." *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 391, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321 (1920).

**12.** Professor LaFave further explained the exclusionary rule:

n. 2, 483 A.2d at 1257 n. 2. Not all evidence obtained during or after an illegal search and seizure, however, need be excluded from trial. The Supreme Court, in *Wong Sun*, stated that [w]e need not hold that all evidence is fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' 371 U.S. at 487–88, 83 S.Ct. at 417, 9 L.Ed.2d at 455.

There exist three judicially acknowledged methods by which evidence can be shown to have been purged of the primary taint. In *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939), the Supreme Court acknowledged that it is possible that the challenged evidence can "become so attenuated as to dissipate the taint." As discussed *infra*, the Court later established a three-part test to determine whether the primary illegal activity has been sufficiently attenuated. In *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the Supreme Court acknowledged the second method of purging the primary taint, known as the "independent source" test. The Court concluded that, if it can be shown that the evidence was discovered as a result of an independent source, the evidence should not be suppressed.[13] *Segura*, 468 U.S. at 814, 104 S.Ct.

---

In the simplest of Fourth Amendment exclusionary rule cases, the challenged evidence is quite clearly 'direct' or 'primary' in its relationship to the prior arrest or search, so that if it is determined that a Fourth Amendment violation has occurred it is apparent that the consequence must be suppression of that evidence in the trial of a defendant who has standing to object to the violation .... Not infrequently, however, challenged evidence is 'secondary' or 'derivative' in character .... In these situations, it is necessary to determine whether the derivative evidence is "tainted" by the prior Fourth Amendment violation.

Wayne R. LaFave, *Search and Seizure* 255 (4th ed.2004).

**13.** In its review of that Court's precedent, the Supreme Court concluded that "it is clear from our prior holdings that 'the exclusionary rule

at 3390, 82 L.Ed.2d at 614–15. The third method of purging the primary taint is known as "inevitable discovery" and operates to permit the introduction of otherwise tainted evidence that would ultimately or inevitably have been discovered notwithstanding a constitutional violation. *Nix v. Williams,* 467 U.S. 431, 443 n. 4, 104 S.Ct. 2501, 2509 n. 4, 81 L.Ed.2d 377, 387 n. 4 (1984). The Supreme Court determined that the rationale for the independent source rule justified its adoption of the inevitable discovery exception.[14]  Id. In the case sub judice, the discovery of the challenged evidence was not necessarily inevitable and was not the result of an independent source.  Instead, the evidence came about as a result of an outstanding warrant and the execution of that warrant. Therefore, we are primarily concerned with whether Officer Weikert's discovery of the outstanding arrest warrant and subsequent lawful arrest, following the unconstitutional seizure, was sufficiently attenuated to be purged of the primary taint.

██  In *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416, 427 (1975), the Supreme Court established a three-part test to determine whether the primary illegal activity has been sufficiently attenuated.  The three factors of the attenuation doctrine are: (1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3)

---

has no application [where] the Government learned of the evidence' from an independent source." *Segura v. United States,* 468 U.S. 796, 805, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599, 609 (1984) (citations omitted).

**14.** In *Nix,* the Supreme Court noted that "[t]he independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation ... [and is] closely related to the inevitable discovery doctrine." *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377, 387 (1984). The Court further acknowledged that there "is a functional similarity between the [ ] two doctrines in that exclusion of evidence that would inevitably have been discovered would ... put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place." *Nix,* 467 U.S. at 444, 104 S.Ct. at 2509, 81 L.Ed.2d at 387.

the purpose and flagrancy of the official misconduct. See *Ferguson,* 301 Md. at 549, 483 A.2d at 1258. Under this analysis, the Supreme Court, "attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Brown,* 422 U.S. at 609, 95 S.Ct. at 2264, 45 L.Ed.2d at 430 (Powell, J., concurring in part). Subsequent cases have pointed out that the attenuation doctrine has been consistently followed as a way of resolving whether there exists a strong enough causal connection between the primary taint and the challenged evidence to require the exclusion of that information.[15]

In 1990, the Supreme Court in *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), reviewed the issue of whether a statement should be excluded from trial due to the illegal, warrantless entry into a suspect's home, which occurred after the police arrested him, brought him to the station, and read him his Miranda rights.[16] Harris was in lawful custody when the police brought him to the station because the police had probable cause to justify his arrest. *Harris,* 495 U.S. at 19, 110 S.Ct. at 1643, 109 L.Ed.2d at 21. The Court held that the "attenuation analysis is only appropriate where, as a threshold matter, courts determine that the challenged evidence is in some sense the product of illegal governmental activity.'" *Id.* (quoting *U.S. v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 1250, 63 L.Ed.2d 537, 545 (1980)). The Court concluded that "[w]here the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an

---

15. *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990); *Ferguson,* 301 Md. at 549, 483 A.2d at 1255; *McMillian v. State,* 85 Md.App. 367, 382–83, 584 A.2d 88, 96 (1991), *vacated on other grounds,* 325 Md. 272, 600 A.2d 430 (1992); *Ryon v. State,* 29 Md.App. 62, 68–72, 349 A.2d 393, 397–400 (1975), *aff'd,* 278 Md. 302, 363 A.2d 243 (1976) *(per curiam).*

16. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

arrest made in the home...." *Harris*, 495 U.S. at 21, 110 S.Ct. at 1644–45, 109 L.Ed.2d at 21 (citations omitted).

The United States Court of Appeals for the Seventh Circuit applied Supreme Court precedent to an issue similar to the one before this Court when it decided *U.S. v. Green*, 111 F.3d 515 (7th Cir.1997). In *Green*, the appellant was the driver of a vehicle which was illegally stopped, resulting in his detention by the police. *Green*, 111 F.3d at 520. The police discovered an outstanding arrest warrant for the passenger during a background check for outstanding warrants. *Green*, 111 F.3d at 517. Subsequently, the police arrested the passenger and searched the car. Id. After the discovery of cocaine and a firearm in the vehicle, Green was arrested and, subsequently, the evidence seized was offered into evidence at his trial. *Id.* The Seventh Circuit Court of Appeals refused to apply a "but/for" test to suppress the evidence. *Green*, 111 F.3d at 520. Instead, the Court applied the Brown three-part attenuation analysis to determine whether the evidence was gained by the exploitation of the illegality or derived by means distinguishable enough to remove the primary taint. Id.

In reviewing the facts of the case, the Seventh Circuit minimized the importance of the first factor—time—noting that the short five-minute time period between the primary illegality and acquisition of the evidence was "not dispositive on the question of taint.'" *Green*, 111 F.3d at 521 (citing *U.S. v. Fazio*, 914 F.2d 950, 958 (7th Cir.1990)).

On the second factor, the court explained:

[t]he intervening circumstances of this case, because they are not outweighed by flagrant official misconduct, dissipate any taint caused by the illegal stop of the Greens. Specifically, after stopping the Green brothers, the officers discovered there was a warrant outstanding for Avery. Accordingly, the officers arrested Avery. With the right to arrest Avery came the right to conduct a search incident to an arrest.

*Id.* (citing *New York v. Belton*, 453 U.S. 454, 459–60, 101 S.Ct. 2860, 2863–64, 69 L.Ed.2d 768, 774 (1981)); *Ferguson*, 301 Md.

at 551, 483 A.2d at 1259 ("[A]n intervening circumstance is an event that breaks the causal connection between the unlawful conduct and the derivative evidence.") (citing *Taylor v. Alabama,* 457 U.S. 687, 691, 102 S.Ct. 2664, 2668, 73 L.Ed.2d 314, 320 (1982)). In *Green,* the Seventh Circuit compared the facts of the case to cases that the Supreme Court and the Seventh Circuit had previously decided in which evidence was found to be sufficiently purged of any illegality.[17] The *Green* court held that cases that involved an outstanding arrest warrant as an intervening circumstance were "even more compelling ... for the conclusion that the taint of the original illegality is dissipated." *Green,* 111 F.3d at 522.

Finally, when analyzing the "purpose and flagrancy of official misconduct," the Seventh Circuit noted that because the police searched the vehicle subsequent to the discovery of the arrest warrant, they did not take advantage of the stop to search the car. *Green,* 111 F.3d at 523. As such, the purpose of the exclusionary rule, to deter police officers from exploiting illegal seizures, would not be furthered by excluding evidence found in the car. Id.

Myers, in this case, states that the Court of Special Appeals relied on the *Green* case to support its judgment. Myers maintains, however, that Green was the exception and not the rule, and should rarely be applied because "it is only the unusual case." Further, he contends that "such a ruling would be a radical departure from well-settled case law in the United States Supreme Court, holding that the knowledge of the officer at the time of the stop controls." We note, however, that decisions rendered after Green make it clear that neither the Seventh Circuit, nor other federal circuits, have adopted Myers's argument.[18]

---

17. *See Brown v. Illinois,* 422 U.S. at 605 n. 12, 95 S.Ct. at 2262 n. 12, 45 L.Ed.2d at 416 n. 12; *U.S. v. Liss,* 103 F.3d 617, 620 (7th Cir. 1997); *U.S. v. Patino,* 830 F.2d 1413, 1419 (7th Cir. 1987).

18. *See U.S. v. Johnson,* 383 F.3d 538 (7th Cir. 2004) (reaffirming the court's decision in *Green* by holding that the search and arrest could not be deemed the purpose of the stop because the officers discovered

Other jurisdictions have held that the discovery of an outstanding warrant and subsequent legal arrest, after an unconstitutional stop or detention, was sufficiently attenuated under the *Brown v. Illinois* analysis. See *State v. Frierson,* 926 So.2d 1139 (Fla.2006); *State v. Page,* 140 Idaho 841, 103 P.3d 454 (2004); *Jacobs v. State,* 128 P.3d 1085 (Okla.Crim.App. 2006); (Holding that an assertion of pretext was not enough to require suppression of evidence obtained after valid arrest on outstanding warrant, discovered after an illegal stop); *People v. Murray,* 312 Ill.App.3d 685, 245 Ill.Dec. 430, 728 N.E.2d 512, 516–17 (2000); *State v. Jones,* 270 Kan. 526, 17 P.3d 359, 360–61 (2001) (recognizing that any conclusion that police cannot arrest a person on a valid warrant after an illegal stop is "illogical and nonsensical"); *State v. Hill,* 725 So.2d 1282, 1286–88 (La.1998) (rejecting the argument that illegal discovery of Petitioner's name, which led to discovery of an outstanding arrest warrant, was grounds for exclusion as an impermissible "but/for" test); *State v. Rothenberger,* 73 Wash.2d 596, 440 P.2d 184, 186 (1968) (referring to the suggestion that police could not make an arrest on a valid outstanding warrant after an illegal stop as "indescribably silly"). But see *State v. Maland,* 140 Idaho 817, 103 P.3d 430 (2004) (acknowledging that a post-seizure discovery of an arrest warrant caused by production of Petitioner's drivers license was not an intervening circumstance dissipating the taint of the illegal entry into a residence).

A divided Florida Supreme Court recently held in *Frierson,* 926 So.2d at 1145, that evidence seized as a result of a search incident to an arrest based upon an outstanding warrant, discovered following an illegal stop, was sufficiently attenuated. In that case, Frierson, a convicted felon, was stopped for failure to use a turn signal and arrested on an outstanding warrant for failure to appear. *Frierson,* 926 So.2d at 1140–41. The subsequent search led to the discovery of a firearm, which

the warrants after the illegal stop); *U.S. v. Simpson,* 439 F.3d 490 (8th Cir. 2006) (holding that the discovery of an outstanding warrant for Simpson's arrest provided officers with independent grounds to search and question him).

was the basis for Frierson's conviction for possession of a firearm by a convicted felon. *Id.* It was later found that not only had the officer lacked reasonable suspicion to stop Frierson but also that the warrant discovered subsequently was actually for another person's failure to appear in court, not Frierson. *Id.* Relying on *Green*, the trial court denied Frierson's motion to suppress the evidence obtained because it had been attenuated based on the officer's belief that there was an outstanding arrest warrant. *Frierson*, 926 So.2d at 1141. The Florida intermediate appellate court reversed. *Frierson*, 926 So.2d at 1142. The Supreme Court of Florida, however, disagreed, relying substantially on the third factor in the Brown analysis. That court held that the outstanding arrest warrant was an intervening circumstance that weighs in favor of the firearm found in a search incident to the outstanding arrest warrant being sufficiently distinguishable from the illegal stop to be purged of the primary taint' of the illegal stop. Crucially, the search was incident to the outstanding warrant and not incident to the illegal stop.

\* \* \* \*

The illegality of the stop does not affect the continuing required enforcement of the court's order that respondent be arrested.

> We believe to be very significant the third factor in the *Brown* analysis, which is whether the purpose and flagrancy of the official misconduct in making the illegal stop outweighs the intervening cause of the outstanding arrest warrant so that the taint of the illegal stop is so onerous that any evidence discovered following the stop must be suppressed.

*Frierson*, 926 So.2d at 1144.

## The Initial Stop By Pennsylvania Police

To resolve the present case, we must analyze: 1) the initial stop made by Officer Weikert; 2) the discovery of the outstanding arrest warrant for Myers; and 3) the search subsequent to his arrest. Collectively the stop, arrest warrant, and the search incident to the arrest, yielded the evidence used by

the Maryland police to support their application for a search warrant for 26 Belview Avenue. We will also consider Washington County Investigator Greg Alton's knowledge of the circumstances leading to Myers's arrest when he obtained and executed the search warrants in Maryland and whether, as a result, he exploited the primary illegal activity.

As discussed supra, the fruit of the poisonous tree doctrine excludes direct and indirect evidence that is a product of police conduct in violation of the Fourth Amendment. Although we assume arguendo that the traffic stop was illegal, Officer Weikert's discovery of an outstanding warrant for Myers's arrest was sufficient to remove the taint of the initial illegal stop from the subsequent search of Myers and his vehicle and is not subject to exclusion under the exclusionary rule as fruit of the poisonous tree. Moreover, we find no evidence in the record to support the conclusion that either Investigator Alton or any of the individuals involved in the application and execution of the search warrant of the Hagerstown residence acted in bad faith. Further, we agree with those courts that have held that an outstanding warrant for the detainee's arrest was an intervening cause capable of attenuating the taint of the illegal stop.[19] The arrest warrant provided Officer Weikert with adequate probable cause to arrest Myers, independent of the initial illegal stop.

We note that the time that elapsed between the illegal stop and the discovery of the evidence varied because there were multiple seizures over a period of time.[20] Some of the evidence was discovered by Officer Weikert in the search immediately following Myers's arrest on the outstanding warrant,[21]

---

**19.** *See U.S. v. Green,* 111 F.3d 515 (7th Cir.1997).

**20.** A search of Myers was conducted shortly after the stop and arrest, and a search warrant was executed for Myers's vehicle by Pennsylvania police seven days after the original stop. In addition, there was an eight-day period between the illegal stop and the issuance of the Maryland search warrant.

**21.** The rare coins and savings bonds issued to William Welsh were discovered on Myers.

while other evidence was discovered after execution of the search warrant for Myers's vehicle, which was impounded.[22] We conclude that the question of timing is not dispositive on the issue of taint, especially because there was an outstanding arrest warrant discovered between the initial stop and the subsequent search incident to the arrest, even though some of the evidence was discovered shortly after the illegal stop.

While recognizing that the warrant was capable of purging the taint to evidence subsequently discovered, it is "the purpose and flagrancy of the official misconduct," which forms the lynchpin of our attenuation analysis. *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62, 45 L.Ed.2d at 427; see *Ferguson*, 301 Md. at 549, 483 A.2d at 1258. If the purpose of Officer Weikert's stop was determined to be "blatantly egregious" and in violation of Myers's Fourth Amendment rights, or for the purpose of searching the vehicle, it can hardly be said that the arrest warrant intervened in those circumstances.

In examining the third factor of Brown, we acknowledge the Court of Special Appeals's discussion of the Sixth Circuit's decision in *Hudson*, supra, 405 F.3d 425. In *Hudson*, Investigator Hesson ("Hesson") acting on the information provided by an anonymous tipster, located Scotty Lee Hudson, who was wanted for armed robbery. *Hudson*, 405 F.3d at 428–29. Hesson learned that Hudson's girlfriend would be arriving at work around 3:00 p.m., where the investigator waited so that he could question her about her boyfriend's location. Id. When Hudson's girlfriend arrived at work, there were also two unidentified males seated in her vehicle. *Hudson*, 405 F.3d at 429. Investigator Hesson speculated that one of the passengers was Hudson, so he approached the car with his weapon drawn and put the occupants in handcuffs in order to search them. Id. That court noted that had the officers positively, or at least reasonably, identified Hudson as a passenger before

---

**22.** The evidence seized contained information listing Myers's address as 26 Belview Avenue and included jewelry from burglaries that occurred in Washington County in January and December of 2002.

approaching [the] car with their guns drawn for example, by reference to a photograph of Hudson, or a composite drawing they would have had reasonable suspicion to seize the car and its occupants. But, lacking reasonable suspicion, the officers elected to seize first and identify second. *Hudson*, 405 F.3d at 434 (alterations in original) (alterations added). Because the purpose of the illegal stop was to arrest Hudson on the outstanding warrant, the court concluded that "the crack cocaine obtained during the illegal stop must be suppressed because it [was] the fruit of the fact that the arrest was made [pursuant to an illegal stop] rather than [a legal one].'" *Hudson*, 405 F.3d at 441 (citation omitted) (alterations in original) (alterations added).

In the case sub judice, although Officer Weikert had a suspicion that Myers may have been engaged in criminal activity, the purpose of the stop was not to effectuate the arrest of Myers on an outstanding warrant or to search his vehicle. Merely because Officer Weikert's stop of Myers was determined to be invalid does not mean that his conduct was flagrant. Instead, Officer Weikert pursued Myers because of what he believed was suspicious activity. The officer initiated the stop after he estimated that the vehicle was traveling at a high rate of speed.

Once Officer Weikert learned Myers's identity and discovered an outstanding warrant for his arrest, the officer gained an independent and intervening reason to arrest and search Myers.[23] Thus, the subsequent search of Myers and his vehicle was separate and apart from the initial stop. We agree with the Court in *Green*, supra, that a chance discovery of an outstanding arrest warrant makes a more compelling intervening circumstance than others. *Green*, 111 F.3d at 522 (noting that in situations where the police elicit incriminating statements, after reading the unlawfully-arrested person his

---

23. Identity may not be suppressed as the "fruit" of an illegal stop under the Fourth Amendment. *See U.S. v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); *Modecki v. State*, 138 Md.App. 372, 771 A.2d 521 (2001).

or her Miranda rights, allows officers the opportunity to influence the actions and reactions of the detainee. "Conversely, where a lawful arrest due to an outstanding warrant is the intervening circumstance, . . . any influence the unlawful stop would have on the defendant's conduct is irrelevant.").

Under the circumstances of this case, the taint of the illegal stop was dissipated by the subsequent legal arrest of Myers pursuant to an outstanding arrest warrant. The search based upon that warrant was justified as a search incident to a lawful arrest. Accordingly, to hold otherwise would not further the goal of deterring unlawful police activity, but would result in the application of an unreasonable "but for" test that was rejected by the Supreme Court in *Wong Sun*, supra.

### The Maryland Search Warrants

■ The evidence that the Maryland police seized from the Hagerstown residence was discovered pursuant to a search warrant, issued and based on evidence taken from Myers and his vehicle in Pennsylvania. If the evidence used to obtain the search warrant was attenuated from the taint of the illegal stop, it follows logically that the evidence seized pursuant to the search warrant would also be attenuated. For the purpose of guiding future decisions in this State, we apply the Brown attenuation analysis assuming that the evidence that formed the basis for the search warrant was, in fact, tainted.

Eight days elapsed between the initial illegal stop on February 12, 2003, and execution of the search warrant on the Hagerstown residence. Washington County Investigator Greg Alton learned of Myers's arrest on the same day as the stop. He immediately became involved, piecing together evidence which led to the discovery of the Hagerstown residence.[24]

---

**24.** We note that time was of the essence for Investigator Alton to obtain a search warrant before the evidence became stale or before it could be moved or discarded. *See Greenstreet v. State*, 392 Md. 652, 674, 898 A.2d 961, 974 (2006) ("The ultimate criterion in determining the degree of evaporation of probable cause . . . is reason. The likelihood that the

During such a short period of time, it was impractical, we conclude, for Investigator Alton—who was unaware of the details of Myers's stop and detention, except that it was made on an outstanding warrant to investigate the procedural and substantive Pennsylvania laws with regard to probable cause and reasonable suspicion. An officer who has no knowledge of the circumstances leading to a defendant's arrest, but knows merely that he was arrested on an outstanding warrant, has no stake in that primary illegal activity nor any reason to investigate it.

**CONCLUSION**

We conclude that it is not merely time, but the judgment and objective reasonableness of the police officer's actions, which will be a decisive factor regarding whether evidence has been attenuated. When Investigator Alton applied for, and executed, a search warrant for the Hagerstown residence, he did so with probable cause and with the apparent good faith belief that the evidence relied upon was not tainted by illegal police conduct. We hold that Investigator Alton and other Maryland law enforcement officers in the course of conducting the search acted reasonably within the constraints of the Fourth Amendment.

As a threshhold matter, we assumed for purposes of this decision that Officer Weikert violated the Fourth Amendment in stopping Myers's vehicle without probable cause. We noted our agreement with the Superior Court that the officer lacked reasonable suspicion to believe that Myers was involved in any other criminal activity. We conclude, however, that the taint from the illegal seizure was dissipated by the subsequent discovery of an outstanding warrant for Myers's arrest and his lawful arrest pursuant to that warrant. Therefore, the evidence obtained during the search of Myers and his vehicle was admissible as a search incident to a lawful arrest. In addition, the subsequent search of the Hagerstown residence was also

---

evidence sought is still in place is a function … of variables that do not punch a clock.'').

lawful. Accordingly, the Circuit Court for Washington County did not err in denying Myers's motion to suppress the evidence.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. PETITIONER TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**