Greene, J. In the case before us, we are asked to consider the constitutionality of the stop and the subsequent search incident to the arrest of Petitioner, Jamal Sizer. On the evening of November 20, 2015, five or six officers of the Howard County Police Department Pathways Patrol Unit, a bicycle patrol unit, observed Mr. Sizer and others congregating in a public parking lot, drinking from what appeared to be an open alcohol container. The officers described the group as “loud and disorderly.” The officers observed a bottle being thrown and heard it hit the ground, but could not see who threw the bottle. The officers approached the group to investigate who in the group threw the bottle. Mr. Sizer fled upon the officers’ approach. A chase ensued and ended with the seizure of Mr. Sizer, which led to the discovery that he possessed a .38 caliber revolver in his backpack. Contemporaneously with the seizure of Mr. Sizer, an officer recognized Mr. Sizer as having an outstanding arrest warrant. Subsequently, pursuant to the discovery of the outstanding warrant, Mr. Sizer was arrested and taken to the local police precinct, where an officer searched Mr. Sizer incident to his arrest and recovered a baggie containing twenty-seven pills of oxycodone, a controlled dangerous substance, hidden in his sock. Mr. Sizer filed a motion to suppress the firearm and the pills recovered from his person, and after a hearing, the Circuit Court for Howard County granted his motion. The State appealed, pursuant to Maryland Code, Courts and Judicial Proceedings Article, § 12-302(c)(4) (1973, 2013 Repl. Vol., 2016 Supp.). In a reported opinion, the Court of Special Appeals reversed the judgment of the Circuit Court, holding that the stop was constitutional. State v. Sizer, 230 Md.App. 640, 668, 149 A.3d 706, 717 (2016). The intermediate appellate court held in the alternative that, assuming arguendo that the stop was unlawful, the evidence recovered would have been admissible under the independent source doctrine because Mr. Sizer was arrested on a valid pre-existing warrant that was independent of the illegal stop. Id. at 669, 149 A.3d at 723. A concurring member of the three-judge panel, Judge Kathryn Graeff, concluded that, assuming arguendo that the stop was illegal, the evidence that was recovered from Mr. Sizer would have been admissible under the attenuation doctrine, rather than the independent source doctrine, in light of this Court’s decisions in Myers v. State, 395 Md. 261, 909 A.2d 1048 (2006), Cox v. State, 397 Md. 200, 916 A.2d 311 (2007), and the United States Supreme Court’s decision in Utah v. Strieff, — U.S. -, 136 S.Ct. 2056, 195 L.Ed.2d 400 (2016). Id. at 680-81, 149 A.3d at 730. We review the issue of whether the officers had reasonable suspicion to stop Mr. Sizer. We hold that the officers had reasonable suspicion to conduct a stop when they witnessed what appeared to be criminal activity occurring immediately before the investigatory stop. In the alternative, we hold that, even assuming the stop was unlawful, the evidence recovered from Mr. Sizer would be admissible in evidence because the attenuation doctrine would apply, pursuant to the Supreme Court’s reasoning in Strieff. For reasons stated in this opinion, we shall affirm the judgment of the Court of Special Appeals to the extent that it held that the officers had reasonable suspicion to stop Mr. Sizer. We also, alternatively, affirm the judgment of the intermediate appellate court and adopt the reasoning of the concurring opinion, penned by Judge Graeff, with respect to the application of the attenuation doctrine. I. Initial Stop The relevant undisputed facts are taken from testimony presented at the suppression hearing. On the evening of November 20, 2015, five or six officers, from the Howard County Police Department Pathway Patrol Unit (“Patrol Unit”), on routine patrol, hiked the footpaths that “lead all throughout Columbia, [Maryland].” While on the footpath, officers in the Patrol Unit observed a group of individuals “play fighting and passing around an alcoholic beverage back and forth.” The Patrol Unit suspected that the beverage was alcohol because it was in a brown paper bag and the group’s body language was “consistent with individuals drinking.” The officers, from 25-35 yards away from the group, observed a bottle being thrown and heard it hit the ground, but could not see who threw the bottle. At that point, the officers approached the group to investigate. When the officers were approximately five feet away, Mr. Sizer fled on foot, away from the officers. Officer Andrew Schlossnagle, one of the officers in the Patrol Unit, gave immediate chase and “physically took [Mr. Sizer] to the ground.” As Mr. Sizer was being tackled to the ground, he revealed that he was carrying a handgun on his person. Within seconds of the takedown, another officer from the Patrol Unit recognized Mr. Sizer as the subject of an outstanding arrest warrant. At that point Mr. Sizer was arrested and taken to the police satellite station in the Village Center pursuant to the officers’ belief that he was the subject of a pre-existing warrant. At the satellite station, the officers confirmed the existence of the warrant and performed a search of Mr. Sizer incident to his arrest. The officers recovered a .38 caliber handgun from Mr. Sizer’s backpack and twenty-seven pills of oxycodone, a controlled dangerous substance, from Mr. Sizer’s sock. Additional facts will be discussed as needed. Suppression Hearing Mr. Sizer moved to suppress the weapon and the pills, arguing that the evidence was obtained pursuant to an unlawful stop. At the suppression hearing, members of the Patrol Unit testified that the Owen Brown Village Center was a “high” or “higher crime area,” compared to other parts of Columbia, Maryland. The State argued that Mr. Sizer’s flight in a high crime area was enough to give the officers reasonable suspicion to conduct a stop under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (“Terry stop”); see also Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (“Terry stop in a high crime area”). The three testifying officers similarly characterized the Owen Brown Village Center as a high crime area. Officer Schlossnagle testified that the Owen Brown, Long Reach, and Oakland Mills Village Centers “tend to [have] an increase in calls for service and just general issues. There tends to be more calls for service in that—in those congested areas.” When asked about what types of crimes he had investigated in the Owen Brown Village Center, the officer responded, “[W]e were tasked to Owen Brown because of the increased calls for service and on-going trends in the area.” The Circuit Court judge interjected: [COURT]: Is “increased calls for service” a nice way of saying “high crime[ ]?” [OFFICER SCHLOSSNAGLE]: Yes, Your Honor. [COURT]: Thank you. I mean, just so I know what we’re talking about. Officer Schlossnagle explained that at the time of the incident, there was “an ongoing robbery series” and that “business owners ... were complaining of quality of life issues, [such as controlled dangerous substance] violations, loitering, drinking, where the business centers requested an increased presence.” Officer Sehlossnagle also explained that “there was a report of a subject displaying a handgun the day before in the footpaths and fields that abut up to the village center.”[1] He testified that “there is a network of footpaths that leads up to the back side of [the village center].” A second officer, Corporal James Zammillo, testified that the Owen Brown Village Center was a “high crime area” as compared to other parts of Columbia. Corporal Zammillo explained that his assignment as a member of the bike team patrol included “passively patrolling the ninety-plus miles of pathway that traverses through Columbia.” Corporal Zammillo confirmed Officer Sehlossnagle’s testimony that there was “an ongoing robbery series” in the area. A third officer, Officer Ronald Baker, the only witness called by the defendant, testified that the patrol officers had been “traveling the pathways, and we came across the Owen Brown Village Center, but we stopped at the entrance to the Owen Brown Village Center via [the] pathway.” He explained that, at the time of observing the group of individuals, he recognized one individual whom he knew had been banned from the Owen Brown Village Center: [STATE]: Is Mr. Davis banned from the—I believe it’s the Owen Brown Village Center? [OFFICER BAKER]: Yes, he is. [STATE]: And you indicated—did you indicate you were waiting for him, to see if he would enter where he was banned from? [OFFICER BAKER]: Yes. [STATE]: And where specifically was that? [OFFICER BAKER]: That particular area we were at, to the best of my knowledge, that parking lot isn’t part of the village center. So, we was [sic] watching him and the group to see if they were going to enter the banned part of the village center. Officer Baker also testified that when the officers were about five feet away, the group noticed the officers. Officer Baker testified that his uniform consisted of a badge and the word “Police” on the front of the jacket in neon lettering. Two other officers testified with a similar description of their uniform. Later, in Officer Baker’s testimony, he stated that it appeared that Mr. Sizer ran as soon as Mr. Sizer observed the officers: [STATE]: How far away were you from this group of suspects—subjects when you believed they noticed you? [OFFICER BAKER]: Well, as we approached, probably about five feet when they turned around to see us. [STATE]: And as soon as they noticed you, did Mr.—did one of the suspects run? [OFFICER BAKER]: Yes. [STATE]: And did you write in your report that as soon as the suspect observed officers ... Is that correct? [OFFICER BAKER]: Yes. ⅛ ⅜ * [STATE]: You indicated in your report that the subject ran as soon as he recognized you were there. [OFFICER BAKER]: It appeared that way; yes. The officers testified that they were concerned with the group’s general disorderliness and possible open container violations. None of the officers testified that they believed the group was connected to the “ongoing robbery series,” or that they suspected any member of the group was the individual who had displayed a gun on the previous night. After the three officers testified, the hearing judge first analyzed whether Mr. Sizer’s flight was legally sufficient to conduct a Terry stop. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The hearing judge found all three testifying officers “to be truthful and credible” and that they had “testified today without embellishment.” She found that “somebody [in] the group they cannot be sure whether it was Mr. Sizer or not—threw a bottle. The police were concerned, understandably, and approached the group.” The hearing judge found that “there had been a complaint made of someone brandishing or displaying a handgun in the parking lot of the Owen Brown Cradlerock Library, and there was, understandably, concern. In general, the area is considered a high or higher-crime area in Columbia.” Nevertheless, the hearing judge suppressed the evidence, and, in doing so, indicated that she questioned whether “all the rules [were] followed[.]” The hearing judge explained, “[T]he fact that Mr. Sizer ran, in and of itself, based on the particular scenario that’s being given here today, is not sufficient.” Further, the hearing judge concluded that the pre-existing arrest warrant did not attenuate the taint of the unconstitutional stop. Procedural History The State appealed the Circuit Court’s decision to suppress the evidence. The Court of Special Appeals reversed the suppression of the weapon and the pills, and held that given the totality of the circumstances, the stop was reasonably justified. Sizer, 230 Md.App. at 658, 149 A.3d at 717. The Court of Special Appeals alternatively held that had the stop not been constitutional, the evidence would not have been suppressed due to Mr. Sizer’s pre-existing arrest warrant, although the three-judge panel disagreed as to the reason for non-suppression of the evidence. Id. at 669, 149 A.3d at 723. Mr. Sizer petitioned this Court for certiorari, which we granted. Sizer v. State, 452 Md. 3, 155 A.3d 890 (2017). In the interest of clarity, we have condensed Mr. Sizer’s questions for certiorari into two questions: Did the arresting officers have reasonable suspicion to stop Mr. Sizer, and if the arresting officers did not have reasonable suspicion to stop and detain Mr. Sizer, was the suppression of the evidence justified?[2] II. Standard of Review When reviewing a hearing judge’s ruling on a motion to suppress evidence under the Fourth Amendment, we consider only the facts generated by the record of the suppression hearing. Longshore v. State, 399 Md. 486, 498, 924 A.2d 1129, 1135 (2007). We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the party prevailing on the motion, in this case, Mr. Sizer. Id. We review the hearing judge’s findings for clear error. Id. Finally, we review the hearing judge’s legal conclusions de novo, making our own independent constitutional evaluation as to whether the officer’s encounter with the defendant was lawful. Ferris v. State, 355 Md. 356, 368, 735 A.2d 491, 497 (1999). In other words, our plenary review of the record for error requires application of the facts under a totality of the circumstances analysis. III. Parties’ Contentions Mr. Sizer’s arguments generally focus on the officers’ consideration of Mr. Sizer’s flight in what the officers characterized as a high crime area. He asserts that the officers did not have a “particularized and objective basis” to support reasonable suspicion for the stop. Mr. Sizer correctly acknowledges that the United States Supreme Court has not imposed a bright-line rule that flight in a high crime area is always sufficient to generate reasonable suspicion of criminal activity. Mr. Sizer postulates, however, that if this Court affirms the suppression court’s decision, it will effectuate a bright-line rule that neither the Supreme Court nor this Court has endorsed. Mr. Sizer relies on the Supreme Court’s decision in Wardlow for his contention that flight is merely a display of a citizen’s constitutional “right to ignore the police and go about his business.” Illinois v. Wardlow, 528 U.S. 119, 125, 120 S.Ct. 678, 676, 145 L.Ed.2d 570, 577 (2000). Finally, Mr. Sizer urges us to hold that flight should be given minimal weight in a totality of the circumstances analysis. The State contends that Mr. Sizer’s flight was merely one of many factors that the officers considered before attempting to conduct an investigatory stop. The State describes these factors as Mr. Sizer’s flight, his presence in a high crime area, the group’s general disorderliness, the suspected open container violation, and the improper disposal of a glass bottle. The State implicitly concedes that the officers did not have a particularized suspicion to stop Mr. Sizer at the moment they approached the group. Instead, the State argues that at the moment the officers approached the group, they had observed enough suspicious activity to warrant further investigation based on the suspected littering and the passing around of an apparent open alcoholic container. Fourth Amendment Terry Stop The Fourth Amendment prohibits “unreasonable searches and seizures.” Generally, when the government has violated a defendant’s Fourth Amendment rights, courts are required to suppress evidence obtained as a result of an unconstitutional search or seizure. Nardone v. United States, 308 U.S. 338, 340-41, 60 S.Ct. 266, 267, 84 L.Ed. 307, 311 (1939); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 391-92, 40 S.Ct. 182, 182-83, 64 L.Ed. 319, 321 (1920); Weeks v. United States, 232 U.S. 383, 398, 34 S.Ct. 341, 346, 58 L.Ed. 652, 657 (1914). The exclusionary rule is “ordinarily ... the appropriate remedy for a violation of the Fourth Amendment.” Myers v. State, 395 Md. 261, 278, 909 A.2d 1048 (2006). Where there is a valid, pre-existing and untainted arrest warrant, however, an exception to the exclusionary rule applies and the evidence obtained in violation of the Fourth Amendment is admissible under the attenuation doctrine. Strieff, — U.S. -, 136 S.Ct. at 2063, 195 L.Ed.2d at 410. Fourth Amendment jurisprudence, as it pertains to stops and seizures, operates along an escalating plane that begins with “unparticularized suspicion[s] or hunch[es]” and crescendos at probable cause. Terry, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909 (internal quotation marks omitted). Reasonable suspicion exists somewhere between unparticular-ized suspicions and probable cause. See Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 309 (1990). “And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or ‘hunch,’ but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.” Terry, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. Reasonable suspicion “has been defined as nothing more than ‘a particularized and objective basis for suspecting the particular person stopped of criminal activity.’ ” Stokes v. State, 362 Md. 407, 415, 765 A.2d 612, 616 (2001) (citing United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 628-29 (1981)) (internal quotation marks omitted); see also Bost v. State, 406 Md. 341, 356, 958 A.2d 356, 365 (2008). Moreover, reasonable suspicion is a “common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act.” Bost, 406 Md. at 356, 958 A.2d at 365, (quoting Stokes v. State, 362 Md. 407, 415, 765 A.2d 612, 616 (2001)). The reasonable suspicion standard “ ‘does not allow [a] law enforcement official to simply assert that innocent conduct was suspicious to him or her.’ ” Crosby v. State, 408 Md. 490, 508, 970 A.2d 894, 904 (2009) (citing Bost v. State, 406 Md. 341, 357, 958 A.2d 356, 365 (2008)). “Rather, the officer must explain how the observed conduct, when viewed in the context of all of the other circumstances known to the officer, was indicative of criminal activity.” Id.; see Derricott v. State, 327 Md. 582, 591, 611 A.2d 592, 597 (1992). When explaining the degrees of suspicion necessary for reasonable suspicion, the Supreme Court has explained that it is a lesser degree of suspicion than probable cause. Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 309 (1990). Specifically: Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Id. (internal citations omitted). There is no universal starting point when it comes to our analysis of a Fourth Amendment violation. We decide where along the plane to begin our analysis depending on the circumstances before us. Here, our analysis begins at reasonable suspicion. We recognize that it is “importan[t] ... not [to] focus[] on any set list of facts that must be present for reasonable suspicion to exist, but rather to examine the totality of the circumstances to determine whether an officer could reasonably suspect that criminal activity is afoot.” State v. Holt, 206 Md.App. 539, 558, 51 A.3d 1, 12 (2012), aff'd, 435 Md. 443, 78 A.3d 415 (2013). Cartnail explains the two analytical techniques used in assessing the totality of the circumstances: The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities. * * * The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in Terry v. Ohio ... said that, “[tjhis demand for specificity in the information upon which police action is predicated is the central teaching of this Court’s Fourth Amendment jurisprudence.” Cartnail v. State, 359 Md. 272, 288, 753 A.2d 519, 527-28 (2000) (quoting United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 698, 66 L.Ed.2d 621, 629 (1981)) (some internal quotations omitted). The Totality of the Circumstances Analysis Both parties agree that our totality of the circumstances analysis must focus on reasonable suspicion, but they dispute whether the factors rise to the level of reasonable suspicion. Petitioner contends that the totality of the circumstances do not rise to reasonable suspicion, even if flight is considered in the Court’s analysis. To the contrary, Respondent argues that even if flight is not considered the officers had reasonable suspicion to stop Mr. Sizer. Petitioner draws our focus to the unprovoked flight factor to refute the officers’ reasonable suspicion, whereas Respondent focuses our attention on the high crime area factor as a means of justifying the officers’ reasonable suspicion surrounding the stop. Because the totality of the circumstances analysis “does not deal with hard certainties,” we determine that an individual’s unprovoked flight or presence in a high crime area, or both, are individual factors that may contribute to the reasonable suspicion calculus. Id. In Wardlow, which both parties rely on to advance their opposing views, the United States Supreme Court discussed the weight to be given unprovoked flight in a high crime area as one factor in the totality of the circumstances analysis. Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). In Wardlow, a team of eight officers, in a four car caravan, travelled through a Chicago neighborhood known for “heavy narcotics trafficking.” Id. at 124, 120 S.Ct. at 676, 145 L.Ed.2d at 576. The defendant, Wardlow, held an opaque bag in his hand, and upon noticing the last car in the police caravan, fled on foot from the outside area where he stood. Id. at 122, 120 S.Ct. at 675, 145 L.Ed.2d at 575. Two officers chased him on foot, and when they finally caught him, they conducted a pat-down and search for weapons. Id. The opaque bag he held contained a .38 caliber handgun. Id. The suppression hearing judge denied Wardlow’s motion to suppress the handgun, the Illinois Appellate Court reversed, and the Illinois Supreme Court affirmed the intermediate appellate court’s conclusion that the evidence should be suppressed. Id. The United States Supreme Court reversed the decision of Illinois’ highest court as to suppression of the evidence. Wardlow, 528 U.S. at 126, 120 S.Ct. at 677, 145 L.Ed.2d at 577. The Supreme Court held that flight in a high crime area was relevant in a totality of the circumstances analysis. It opined that: An individual’s presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a “high crime area” among the relevant contextual considerations in a Terry analysis. Id. at 124, 120 S.Ct. at 676, 146 L.Ed.2d at 576 (internal citations omitted) (emphasis added). Specifically, the Supreme Court explained: In this case, moreover, it was not merely respondent’s presence in an area of heavy narcotics trafficking that aroused the officers’ suspicion, but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. Id. (internal citations omitted). In Bost v. State, we had occasion to consider whether a defendant’s flight in a high crime area supplied officers with the necessary reasonable suspicion to stop him. 406 Md. 341, 348, 958 A.2d 356, 359 (2008). Officers observed Mr. Bost and a group of people drinking alcohol and loitering on a sidewalk in a drug-trafficking area, located in Washington, D.C., three blocks from the Maryland border. Id. at 346, 958 A.2d at 360. As the officers approached Mr. Bost, he began briskly walking away and took flight “while clutching his right waistband ....” Id. An officer pursued him on foot, under the suspicion that he was concealing a weapon and based on the officer’s experience that Mr. Bost’s clutching of his waistband was consistent with someone trying to conceal a weapon. Id. Officers tackled him to the ground and then found a gun tied around his neck. Id. Officers arrested him, and upon a search incident to the arrest, discovered $140 in cash and two, white, rock-like substances, later determined to be crack cocaine, on his person. Id. Mr. Bost moved to suppress the seized cocaine and weapon on the basis that the evidence was seized in violation of the Maryland Uniform Act on Fresh Pursuit.[3] Id. at 347, 958 A.2d at 358. Upon review, we held that officers had reasonable suspicion to stop Mr. Bost because he was seen in a high crime, drug-trafficking area, he took off in unprovoked flight, and he was clutching his side, in what appeared to be an attempt to conceal a weapon. Id. at 359-60, 958 A.2d at 360. In the case, we relied on Wardloiv for the generalized proposition that that case “had made clear that unprovoked flight is enough to support reasonable suspicion that a crime has been committed.” Id. at 348, 958 A.2d at 360 (emphasis added). Notwithstanding our focus on unprovoked flight, in Bost we applied a totality of the circumstances analysis, as the Wardlaw Court had done, and held that Mr. Bost’s unprovoked flight was properly considered in the totality of the circumstances analysis. Id. at 359, 958 A.2d at 360. In Crosby, we emphasized the need for hearing courts to consider the totality of the circumstances when wholly innocent actions take place in a high crime area. Crosby v. State, 408 Md. 490, 508, 970 A.2d 894, 904 (2009). In that case, an arresting officer, at the suppression hearing, testified that he made the decision to approach a driver in a parked car because: the driver was in a high crime area, he pulled in and out of “parking pads,” he was in an area where a recent homicide had occurred, he switched his left turn signal to a right turn signal, and he drove in a “big loop.” Id. at 500, 970 A.2d at 899. We reversed the Circuit Court’s denial of Mr. Crosby’s motion to suppress the evidence and held that the factors the arresting officer relied on “[did] not constitute ingredients that [were] sufficiently potent enough in [that] case to enrich the porridge to the constitutionally required consistency of reasonable suspicion,” because “the combination of [innocent] factors, viewed in their totality, [were] no more indicative of criminal activity than any one factor assessed individually.” Id. at 511-513, 970 A.2d at 906-07. The Hearing Judge’s Analysis of the Totality of the Circumstances In the instant case, although we determine that the police officers had reasonable suspicion to stop Mr. Sizer, we conclude that the suppression hearing judge erred in her application of the totality of the circumstances analysis because she based her decision on ambiguous testimony and identified Mr. Sizer’s flight as the dispositive factor in the analysis. The suppression hearing judge did not properly consider other pertinent factors in her application of the totality of the circumstances analysis. There was no evidence at the suppression hearing that established that the parking lot was located in the Owen Brown Village Center or established how near it was to the Owen Brown Village Center or the area where the handgun violation had occurred. In fact, Officer Baker testified that “to the best of [his] knowledge, that parking lot isn’t part of the [V]illage [C]enter.” He also testified that the Patrol Unit was “waiting to see if [one of the members of Mr. Sizer’s group] would enter where he was banned from.” Given that the officer was waiting to see whether a certain individual would enter the banned Village Center area, this individual, along with the remaining group members, including Mr. Sizer, was not in the Owen Brown Village Center. The suppression hearing judge did not receive any testimony regarding whether the group was connected in any way to the Owen Brown Village Center. None of the officers testified that the group, or any member of the group, was seen leaving or approaching the Village Center at any time during the officers’ patrol of the pathways. The officers did not observe anyone joining or leaving the group during their time of observation. Nor did they testify that they observed the group demonstrating behavior consistent with the nature of the crimes that led them to conclude that the Village Center was a high crime area. Furthermore, none of the officers testified that they suspected any member of Mr. Sizer’s group to be connected to the weapon violation that had been reported the previous day. As was true for the location of the Village Center, the two officers who testified about the handgun violation did not provide any proximal description of the area where the violation had occurred and its relation to the parking lot where Mr. Sizer was observed. Because we determine that the Circuit Court erred in its application of the totality of the circumstances analysis, we need not decide whether the Circuit Court’s erred in finding that the parking lot was a “high or higher crime area.” In her analysis, the suppression hearing judge did not consider other pertinent factors in their totality, such as the officers’ suspicion of an open container violation or their attempt to investigate the littering. Instead she found that, “the fact that Mr. Sizer ran, in and of itself, based on the particular scenario .,. [was] not sufficient” to justify the stop. The hearing judge had sufficient facts before her to apply the reasonable suspicion test from Terry, but she overlooked the import of two possible crimes that had occurred in the officers’ presence along with Mr. Sizer’s unprovoked flight as officers approached to investigate. In other words, her analysis abandoned consideration of the totality of the circumstances. “Under the totality of circumstances, no one factor is dispositive.” In re David S., 367 Md. 523, 535, 789 A.2d 607, 614 (2002). Therefore, the hearing judge erred when she failed to consider the totality of the circumstances.[4] Our Analysis of the Totality of the Circumstances Upon our independent review of the factors that were before the hearing judge, we hold that under the totality of the circumstances, the officers had reasonable suspicion to stop Mr. Sizer to investigate a possible open container violation as well as the improper disposal of a glass container, whether he was in a high crime area or not. Even Mr. Sizer concedes that when the officers approached him they were “investigating the improper disposal of a bottle.” Pursuant to Maryland Code, Criminal Law § 10-110 (2002, 2012 Repl. Vol., 2015 Supp. Vol), the improper disposal of waste is a criminal misdemeanor punishable by imprisonment or fines.[5] Pursuant to the Howard County Code, Title 8, Subtitle 7, § 8.700 (2016), consuming or possessing alcoholic beverages on posted commercial property or posted public parking lots is a criminal misdemeanor punishable by imprisonment or fines. Therefore, when officers observed that a bottle was passed among the group and then was discarded or thrown to the ground, they had reasonable suspicion to believe that criminal activity was afoot. Mr. Sizer’s flight from the group as the officers approached to investigate probable crimes committed in their presence shifted their focus to Mr. Sizer, which could have reasonably heightened their suspicion that he was the individual responsible for throwing the bottle. When Mr. Sizer ran, his flight obviously drew the officers’ attention and intensified the officers’ investigation by shifting their focus from the group to him as an individual. In fact, according to Officer Baker, who testified at the suppression hearing, it appeared that Mr. Sizer ran as soon as he realized that the people approaching were police. Thus, in conducting their investigation the officers were not required to “simply shrug [their] shoulders and allow ... [an apparent] criminal [misdemean-ant] to escape.” Holt v. State, 435 Md. 443, 459, 78 A.3d 415, 424 (quoting Adams v. Williams, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 616 (1972)). Mr. Sizer asserts that “officers can ‘investigate’ whatever they want, for any reason they want, but they cannot stop a person without reasonable suspicion that criminal activity is afoot,” and that here the officers’ testimony was insufficient to establish reasonable suspicion that a crime was being committed. We disagree that the investigating officers’ testimony in this case was insufficient to establish reasonable suspicion of suspected criminal activity because Mr. Sizer overlooks the significance of the officers’ decision to investigate based on the improper disposal of the bottle. The investigatory nature of a stop does not violate the Fourth Amendment if the stop is based on a reasonable suspicion. See Terry, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909 (“And in determining whether the officer acted reasonably in such circumstances, due weight must be given ... to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.”). This Court has previously examined how the Supreme Court has reconciled the tension between an individual’s right to freedom from unlawful detainment and the extent to which an officer may conduct an investigatory stop and we recognized that the Supreme Court held that officers may “stop and briefly detain a person for investigative purposes if the officers have a reasonable suspicion, supported by articulable facts, that ‘criminal activity’ may be afoot.” In re David S., 367 Md. at 532, 789 A.2d at 612 (citing Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911 (1969); see United States v. Scott, 270 F.3d 30, 41 (1st Cir.2001) (recognizing that “[a]n individual’s flight from police combined with other observations by a police officer may support reasonable suspicion sufficient for detention under Terry" and also acknowledging that “[i]n Wardlow itself, the only relevant fact other than flight known to the detaining officer was the suspect’s presence in an area known for crime,” and noting that “prior behavior ... suggests] guilt more strongly than would simple presence in such an area”) (internal citations omitted). In summation, the officers had reasonable suspicion to investigate the group prior to Mr. Sizer’s flight. The officers suspected that members of the group were consuming alcohol; then the officers observed the improper disposal of a bottle. Because a bottle was thrown to the ground, it logically follows that at least one member of Mr. Sizer’s group was responsible for the improper disposal of the bottle. Mr. Sizer’s flight, however, drew the officers’ attention away from the group and towards him individually. Based on these circumstances, we conclude that the officers had reasonable suspicion to stop Mr. Sizer. After being informed that he was armed with a weapon, the officers had reasonable suspicion to frisk him.[6] Therefore, we affirm the judgment of the intermediate appellate court on the basis that upon witnessing the likelihood that criminal activity was afoot, the officers had reasonable suspicion to approach the group and investigate an apparent open-container violation and littering and to stop Mr. Sizer. Application of the Attenuation Doctrine Our primary holding is that the apprehension of Mr. Sizer after he ran from the group that was assembled in the parking lot constituted a valid Terry stop. We hold, in the alternative, that assuming the stop of Mr. Sizer was unlawful, the police officer’s discovery of a valid pre-existing arrest warrant attenuated the connection between any unlawful investigatory stop and evidence seized from Mr. Sizer during the search incident to his arrest. Accordingly, there would be no justification for applying the exclusionary rule to the facts of this case. The State and Mr. Sizer concur that Utah v. Strieff would control the outcome of this case if the stop were deemed unlawful. In its brief, the State pressed the argument that the independent source doctrine or the attenuation doctrine would apply; however, at oral argument, counsel for the State conceded that the attenuation doctrine was on point based on the facts. Mr. Sizer agrees that the outstanding arrest warrant is an intervening circumstance pursuant to Strieff; however, he bifurcates the evidence recovered from his person to suggest that the pre-existing arrest warrant operates as an intervening circumstance only with respect to the pills, not the revolver. Mr. Sizer argues that the evidence of the revolver “came to light before the officers discovered a valid warrant for Petitioner’s arrest.” Recently, in Strieff, the United States Supreme Court applied the attenuation doctrine when it evaluated whether a pre-existing arrest warrant sufficiently attenuated “the causal link between the government’s unlawful act and the discovery of evidence^]” — U.S. -, 136 S.Ct. at 2061, 195 L.Ed.2d at 408. We follow the precedent of that Court, which directs us to evaluate the three factors articulated in Brown: First, we look to the “temporal proximity” between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Second, we consider “the presence of intervening circumstances.” Third, and “particularly” significant, we examine “the purpose and flagrancy of the official misconduct.” Strieff, — U.S. -, 136 S.Ct. at 2062, 196 L.Ed.2d at 408 (citing to Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416, 427 (1975) (internal citations omitted). In Strieff, the Supreme Court reasoned that that an outstanding arrest warrant was “a critical intervening circumstance that is wholly independent of the illegal stop” and therefore the illegal stop was “sufficiently attenuated by the pre-existing arrest warrant.” — U.S. -, 136 S.Ct. at 2063, 195 L.Ed.2d at 410 (internal citation omitted) (internal quotation marks omitted); see also Myers v. State, 395 Md. 261, 290, 909 A.2d 1048, 1065 (2006); Cox v. State, 397 Md. 200, 209-10, 916 A.2d 311, 316-17 (2007). The application of the attenuation doctrine is a fact-specific analysis that focuses on when and the manner in which the evidence seized was obtained in relation to the unlawful conduct. Where there is an outstanding arrest warrant, the attenuation doctrine applies because the discovery of the warrant breaks the causal chain from any possible taint to the evidence collected. Here, even assuming that the stop of Mr. Sizer was unlawful, the discovery of a valid pre-existing arrest warrant as well as absence of flagrant police misconduct, notwithstanding the close temporal proximity between the illegal seizure and the discovery of the pistol, would result in the non-suppression of the evidence. Mr. Sizer focuses on the closeness of the timing of the discovery of the revolver in relation to the discovery of the outstanding arrest warrant. He argues that because his admission about the revolver came before the discovery of the outstanding warrant, the warrant could not attenuate the taint of the alleged unlawful stop. We disagree. We have previously held that “the question of timing is not dispositive on the issue of taint, especially because there was an outstanding arrest warrant between the initial stop and the subsequent search incident to arrest, even though some of the evidence was discovered shortly after the illegal stop.” Myers, 395 Md. 261, 292, 909 A.2d at 1066 (emphasis added). The “temporal proximity” between Mr. Sizer’s alleged unlawful stop and the discovery of the revolver favors suppression of the evidence; however, this factor is outweighed by the intervening circumstance and the absence of flagrant police misconduct. See e.g. Cox v. State, 397 Md. 200, 218, 916 A.2d 311, 322 (2007) (holding that a two minute time lapse weighed in the defendant’s favor but recognizing that, “[t]he temporal proximity factor must depend ... on other factors to which it relates, because a ‘lengthy detention can be used to exploit an illegal arrest at least as easily as a brief detention.’ ” (quoting Ferguson v. State, 301 Md. 542, 550, 483 A.2d 1255, 1259 (1984)). The discovery of the pre-existing warrant sufficiently broke the causal chain between any Fourth Amendment violation alleged by Mr. Sizer and the recovery of the evidence against Mr. Sizer. Therefore, had the stop of Mr. Sizer been unlawful, the evidence recovered would still be admissible under the attenuation doctrine. Conclusion The officers of the Patrol Unit had reasonable suspicion to investigate what appeared to be criminal acts occurring in their presence and, thus, had reasonable suspicion to stop Mr. Sizer to investigate whether he had improperly disposed of a bottle. The stop was not unconstitutional. During the course of the stop, Mr. Sizer alerted the officers to the presence of a gun, which justified the officers’ frisk of his person. The gun and the pills should not have been suppressed because they were recovered after a lawful detention. Alternatively, the gun and the pills would be admissible into evidence as a result of the search incident to the lawful arrest of Mr. Sizer, pursuant to the discovery of the outstanding arrest warrant. We affirm the judgment of the Court of Special Appeals, albeit for different reasons. Accordingly, the motion to suppress should have been denied. JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT TO BE PAID BY PETITIONER. Adkins and Hotten, JJ., concur and dissent. . Collectively, the testimony from two officers about the location of the handgun incident can, at best, be described as ambiguous. On cross examination, one officer described the incident as having been reported “that there was a handgun seen in the area the day beforef.]” On redirect, that officer testified that the handgun was displayed “near a school and also near a community center and a library[.]” Another officer testified that “there was an individual reportedly armed with a handgun and pointing it in the area [ ] passing the parking lot of the Howard County Library off Cradlerock.” . Mr. Sizer’s petition for certiorari raised the following questions: (1) Where the police illegally stop a person, discover a valid, preexisting arrest warrant, and seize evidence from the person during a search incident to arrest, must the admissibility of that evidence be determined based on an application of the "attenuation factors,” as held in Utah v. Strieff, — U.S. -, 136 S.Ct. 2056, 195 L.Ed.2d 400 (2016), Cox v. State, 397 Md. 200, 916 A.2d 311 (2007), and Myers v. State, 395 Md. 261, 909 A.2d 1048 (2006), or may a court, as the Court of Special Appeals did in this case, reject the attenuation doctrine and find that such evidence will always be admissible because the arrest warrant constitutes an "independent source”? (2) Did the hearing judge correctly rule that the discovery of a valid, pre-existing arrest warrant did not attenuate the connection between the illegal "takedown” of Petitioner and the evidence seized from him shortly thereafter? (3) Where a person is under no obligation to interact with the police, does flight to avoid that interaction, by itself, justify a Terry stop; and if so, does it still justify the stop where there is evidence that flight was provoked by the threatening or startling actions of police officers? (4) Did the hearing judge correctly rule that the police violated Petitioner's Fourth Amendment rights where, inter alia, six officers patrolling the footpaths of Columbia on unmarked bicycles after dark, who testified that, especially at night, people do not immediately recognize them as police, rode towards a loud group of people to investigate the improper disposal of a glass bottle, the group first noticed the officers when they were five feet away and was visibly "startled,” and the only observation officers made regarding Petitioner before tackling him was that he immediately ran upon noticing the six bicyclists riding towards him? . The Uniform Act on Fresh Pursuit [Maryland Code, Criminal Procedure § 2-305 (2001, 2006 Cum. Supp.)] permits ‘‘[a] member of a state, county, or municipal law enforcement unit of another state who enters [Maryland] in fresh pursuit and continues within [Maryland] in fresh pursuit of a person to arrest the person on the ground that the person is believed to have committed a felony in the other state has the same authority to arrest ... the person.” Bost v. State, 406 Md. 341, 345, 958 A.2d 356, 358 n.l (2008). . According to the Concurring/Dissenting Opinion, the Majority Opinion mischaracterizes the hearing judge's conclusions of law. Concurrence/Dissent Op. at 383-84, 174 A.3d at 345-46. The Concurrence/Dis-sen! concludes that the hearing judge considered the totality of the circumstances in her "scenario" but fails to explain what law the hearing judge applied to the facts in order to conclude that Mr. Sizer's flight and the “scenario” was not sufficient. Without more, neither we, nor the Concurrence/Dissent can say precisely what the hearing judge meant when she concluded that the “scenario” was insufficient. . Mr. Sizer was not charged with improper disposal of waste or with an open container violation. . The Concurring/Dissenting Opinion describes the stop of Mr. Sizer as a "hard, take-down” and criticizes the officer’s conduct as unreasonable. Con./Diss. Op. at 385-86, 174 A.3d at 347-48. To support its contention that the take-down was unreasonable, the Concurring/Dissenting Opinion cites to Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In that case, however, the Supreme Court points out that "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight” is among the factors considered under the objective reasonableness standard. Id. at 396, 109 S.Ct. at 1872, 104 L.Ed.2d at 445 (emphasis added). Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.” Id. at 396-97, 109 S.Ct. at 1872, 104 L.Ed.2d at 455-56.